Good afternoon, Your Honors. May it please the Court, Brandon Verdream here on behalf of Plaintiff Appellant Antonio Pearson. May I please have two minutes of rebuttal time? That request will be granted. Your Honors, forty years ago, the Supreme Court in Estelle prescribed or held that the Eighth Amendment prescribes the unnecessary, wanton infliction of pain as being inconsistent with contemporary standards of decency with respect to inmates. We have that situation in this case with respect to Mr. Pearson and in particular with respect to Nurse Rhodes. On April 11, 2007, Mr. Pearson, excuse me, late on April 10, 2007, Mr. Pearson suffered from extreme pain to the point in which he was screaming, other inmates heard him screaming and a call had to be made to Nurse Rhodes. Nurse Rhodes did not come to Mr. Pearson to check on him at that time. The screaming continued for over three hours later at 2.30 in the morning on April 11th when Nurse Rhodes finally relented and came to see Mr. Pearson. Counselor, I understand your position to be that you don't need to present medical expert testimony, but is it the case you're not claiming as any error on appeal that you were denied an expert to be able to establish standards of care as relevant to the deliberate indifference claim? That is correct, Your Honor. We were denied the attempt to seek funds. We requested funds for an expert in order to identify the expert, in order to obtain expert testimony with respect to the state law claims that Mr. Pearson had against the defendants. But part of the magistrate and then the district court adopting that R&R, part of the reasoning seems to be that you didn't have expert testimony. Of course, you'd been denied an expert in the denial of that motion. My question is, is that part of any error that you were claiming on appeal, or do you concede that the motion, the request you were making, was limited to the need for the certificate for purposes of a negligence action against the surgeon in the hospital? That is correct, Your Honor. We do not feel that expert testimony is necessary in this case. In particular, with respect to Nurse Rhodes and him forcing Mr. Pearson to crawl across a cement floor of his cell in order to get to a wheelchair, we feel that that violates the common standards of decency that Estelle talked about over 40 years ago. Mr. Pearson claimed that that caused him to suffer even more pain than what he was already in, and shortly thereafter, three hours later, he was taken to the emergency room at Somerset Hospital for an appendectomy. He had an appendectomy to remove his appendix, as well as a portion of his omentum. In focusing on Nurse Rhodes, are you abandoning your claims of deliberate indifference as to the other nurses and Dr. McGrath? I am not, Your Honor. I just wanted to start with Nurse Rhodes because I thought that that portion of the record, which the lower court describes as callousness, which to me, I think, in and of itself, the word callousness raises a question for the jury as to whether or not that's deliberate indifference. I actually looked up the term callousness on Merriam-Webster's, on the Merriam-Webster website, which talks about callousness being hardened, thickened, feeling no emotion, feeling or showing no sympathy for others, or hard-hearted, and then in parentheses, that talks about a callous indifference to suffering. So I wanted to start and focus on that instance with respect to Nurse Rhodes, and that we believe that an inference could be made, viewing the record in the light most favorable to Mr. Pearson, we believe that an inference could be made, that a jury could reasonably conclude that Nurse Rhodes was deliberately indifferent to his serious medical needs. Is that only as to the conduct in the cell, or is that also as to waiting the couple of hours in the infirmary, or not coming when there was an initial call? It applies to everything with respect to Nurse Rhodes, and I'll try to address each nurse or doctor in order, because I think that helps to kind of delineate what happened here. So Nurse Rhodes, on that late the night before at about 11 p.m., was called by the corrections officer, because Mr. Pearson requested that, because he was doubled over in pain and was screaming. So he asked for medical to be called. Unfortunately for Mr. Pearson, he had already been seen twice that day by two other nurses, so the response he got back from Nurse Rhodes through the corrections officer was that Nurse Rhodes was not going to come see him, because he had already been seen twice that day and he was on sick call for the next day. How, without evidence of what was actually communicated at that point to Nurse Rhodes, is there evidence that the nurse was actually aware of the substantial risk at that point of being appendicitis? When he did not come in response to the call, I think if you look at the evidence in total, you can see that there are two prior calls for, that Nurse Rhodes allegedly said that he knew of, two prior calls for pain, and now he has a call for screaming in pain from a corrections officer. How do we know that that was communicated? That he was screaming in pain? Correct. Well, we know we have a call at 11 o'clock for a medical need at that point in time. How do we know what was communicated in that call? Because the officer, according to Mr. Pearson, the officer came back and told him that he wasn't coming to see him at that time. Nurse Rhodes was not coming to see him in response to his need for medical attention, and that he was going to have to wait because he had already been seen twice that day and was on sick call for the next day. What does that reflect as far as the record on what was communicated about Mr. Pearson's condition or screaming at that point to the nurse? What was exactly communicated by the officer to Nurse Rhodes, I don't know. I'm not sure if, it's not reflected in the record, and I'm not sure we can even get to that because Mr. Pearson not knowing the officer who it was as he was in pain at that time. But at least, if you look at the evidence in a late-match favorable to Mr. Pearson, you have Nurse Rhodes knowing of two times that day, earlier that day, that he was seen for pain, and then Nurse Rhodes denies coming to see him on the third time because he had already been seen that day. So that's a reasonable request for medical treatment that's just flat denied, and the courts have held that that can manifest as deliberate indifference to serious medical needs. On behalf of Nurse Rhodes and others, the government raises qualified immunity, for us at least. What's your position on that? Well, Your Honor, if you have a clearly established constitutional right, which we believe we have here in the Eighth Amendment that has been violated, then qualified immunity is inapplicable, and we believe we have sufficient evidence to at least create a genuine issue of material fact that should go to a jury as to whether or not these defendants, appellees, were deliberately indifferent to his serious medical needs. Counsel, I know you haven't mentioned him, but I thought you had a harder case against the doctor. I mean, he's not there all the time, and he's coming in, and he's, you know, going to other places. What did the doctor do to reach the level? Well, I see plenty of doctors, and I don't always agree with them, but I don't think they're indifferent. I mean, they may say you need this or that, but what did he do that was deliberately indifferent? Thank you, Judge Greenberg. With respect to Dr. McGrath, we have to look at the totality here, the entire context of Dr. McGrath's interaction with Mr. Pearson. So Mr. Pearson went for his appendicitis on surgery, and then he returned back to SDI Green following his surgery, and he was examined by Dr. McGrath. And as part of his discharge, the discharge summary that went with Mr. Pearson, it talked about not having any restrictions, or having restrictions of not lifting more than 20 pounds, and then also that he needed to have a follow-up conference with his surgeon within one week that needed to be set up by the hospital, as the surgeon has testified that it's set up, or set up by the prison, excuse me. Those two things were not done. Dr. McGrath released him back to the typical or to the hospital, and the very next day, Mr. Pearson presents with blood profusely coming from his genital area that soaked his long jaunts and his underwear. He sees a nurse who tells him that based on the looks of this, don't get undressed because I think you're going to be sent to the emergency room. Nurse Madar calls Dr. McGrath and reports to him, reports back to Mr. Pearson that he's not being sent to the emergency room, and in fact, Dr. McGrath was upset, was mad that he was called at night that time with respect to that situation. What is the fact, though, that, I mean, they did send him to the hospital. I mean, isn't this perhaps a case where they just misdiagnosed his difficulties? I mean, he said stomach pain. He started with stomach pain. A lot of people have stomach pain. It's hard to figure out what stomach pain is coming from. I mean, I think you can easily make a misdiagnosis case, but aside from perhaps making Pearson crawl to the wheelchair, is misdiagnosis the equivalent of deliberate indifference? No, it's not, Your Honor, and we're not making a claim of misdiagnosis here. What we're making a claim of is that they either delayed or just outright denied care to Mr. Pearson. And it starts with, if you start with Nurse Klein, who told Mr. Pearson that she thought that his Tylenol or Maalox didn't contact a physician, didn't contact a physician's assistant, didn't contact a doctor, didn't send him out for emergency surgery at that time. And this is at 5 o'clock the day before he was eventually sent out for emergency surgery for his appendectomy. So she has, her subjective knowledge is that she believed that his gallbladder was failing, and in response she offered Tylenol or Maalox. That sounds like a misdiagnosis to me. Of the gallbladder failing? Yeah. Well, she eventually was wrong about that. It was an appendix. But still, it's a serious medical need. There's a case from the New Jersey... How did she know that at the time? Based on her personal experience. Her personal experience, according to Mr. Pearson, was that she said based on her personal experience she felt that his gallbladder was failing. So she has the subjective knowledge at that time of a serious medical need. Has Mr. Pearson brought forth any extrinsic evidence showing that the defendants here were negligent in the way they conducted their operations? The focus, we haven't had a focus on standard of care or negligence. Our focus has been on, and Mr. Pearson's focus has been on, the fact that they either denied or delayed care or refused to provide care, refused to respond to reasonable requests for medical treatment. You agree under VA's amendment what we have to look at is their subjective awareness. It's an actual awareness standard. And what the record seems to reflect as to both Nurse Thomas and Nurse Klein is, even if erroneous, what they actually were aware of, what they actually believed at the time, was not this was an emergency situation or one that required, one that involved a substantial risk of harm that required urgent action. And it may be another story if somebody diagnoses, recognizes, and documents their awareness of the possibility of appendicitis. But that wasn't the case as to Nurse Thomas and Nurse Klein, correct? With respect to Nurse Thomas, admittedly it's a more difficult situation with respect to Mr. Pearson's claims. But with respect to Nurse Klein, according to Mr. Pearson, she said based on her personal experience she felt that his gallbladder was failing. That is a serious medical need to which she offered no relief, or to which she offered no treatment. To say that she offered Tylenol. Did she schedule him to see a doctor the next day? He was already on sick call for the next day. Okay. Well, I mean, the doctor's coming in the next day. He's on sick call. Short of sending him to Somerset Hospital immediately, what else was she supposed to do at that stage? Call the doctor and say that she felt that his gallbladder was failing at the time based on her personal experience. And? It's a serious medical need that she basically just disregarded. Can you go back for a moment to talk about Dr. McGrath and what we should be given, and that's the bleeding, not the appendicitis, what should we do at the point in time he was called? Again, we have a very limited record on what is actually communicated to the doctor. Given what's in that record, how could we say that there was an error in the district court's decision and that he didn't actually draw the inference that there was a substantial risk of harm? I think with Dr. McGrath, you look at it from two points. First, you have Nurse Magar calling him and telling him about the situation that involved Mr. Pearson, where he told him that, hey, be ready, you're probably going to the emergency room after he saw the amount of blood that was on his long johns. The second point, then, is when he finally does see Mr. Pearson the following day, he doesn't see the amount of blood that was discharged from Mr. Pearson the prior day and basically chalks it up to being normal and sends Mr. Pearson on his way. And if he looked at, as he testified under oath, that he did look at the history, if he looked at the history at the records, you would see an objective notation from Nurse Klein from the night before talking about copious amounts of blood being discharged from Mr. Pearson's penis. But when he sees him in the morning, it's just trace amounts of blood. And, again, since we need to look at the subjective knowledge and the awareness at that time, and without medical testimony that this somehow falls below a reasonable standard of care, how could we conclude that the doctor was being deliberately indifferent, seeing that improvement in the morning, by waiting until later in the day when there was a change in his condition? I think looking at the totality of the events involving Dr. McGrath, number one, not setting up the telemed appointment with the surgeon. As soon as Mr. Pearson came back following the appendectomy. Number two, being upset at being called and being bothered by the call from Mr. Pearson when he was bleeding copious amounts from his penis. And then number three, Dr. McGrath basically saying this is a normal occurrence without seeing the notes, or if he did see the notes, disregarding the notes that talk about the copious amounts of blood being discharged the night before. I think if you look at those in total, I think a jury could reasonably conclude that he was deliberately indifferent to Mr. Pearson's serious medical needs. What you're saying here is you're not claiming you're entitled to judgment at this point. You just want a trial. Absolutely correct, Judge Greenberg. Absolutely correct. We just believe that there's a sufficient showing of evidence that reasonable minds can differ and that there are genuine issues of material fact that need to be resolved at trial. What does the court do? It tells the jury you have to find deliberate indifference, and then it defines deliberate indifference, I guess. It's funny, you usually don't see trials in these cases. They usually come up on motions. I guess the jury then has to listen to the facts and decide. Correct, Your Honor. That's what we believe that Mr. Pearson is entitled to. A jury can believe or disbelieve that they were deliberately indifferent to his serious medical needs just the same as they could believe or disbelieve the amount of harm that he suffered due to their actions when he suffered in pain and has stated that he has suffered in tremendous pain. Counselor, if any of these claims do proceed to trial, that is if we were to reverse and remand on any of them, do you take any position as to whether, given that that would be our third remand in this case, there's a need to consider reassignment to a different district court judge or magistrate? Your Honor, I'm well over my time. I'm assuming that's okay. You can go ahead and answer that question. Thank you. You may want to be cut off from answering it, though. Is that what you're looking for? No, that's okay. Judge Goss, Mr. Pearson, after the first reversal requested, recusal of both the magistrate and the district judge in this case, there are things that are in the magistrate's opinion that are somewhat disconcerting with respect to discussions about these types of cases and the fact that this is now the third time when we feel that the first two times, and this applies both to the magistrate and to the district judge, we feel that they were prematurely dismissed, and this Court agreed with that on the first two occasions. We haven't given consideration yet as far as if it does go back to trial,  whether or not there's any avenue left for us to possibly have it assigned to a different court. Well, one thing you have to admit, this court hasn't been deliberately indifferent. I would agree with that, Judge Greenberg. It definitely has not been and has been well attentive, and Judge Greenberg, I believe you were on the second decision with respect to the reversal, and this court has taken the time to look through the record and to look through the analysis with respect to the claims being made by Mr. Pearson. Just one question I have a note here. Is your firm representing Mr. Pearson pro bono? Yes, Your Honor. When was that assignment made? Was it made by our court or was it made by the district court? The district court, Your Honor. And you've continued in that capacity? Yes, Your Honor. Well, we commend you for that. Oh, thank you. I appreciate that, Your Honor. Okay. We'll have you back on rebuttal. Thank you. Can we have First Miss Kenyon? Yes, Your Honor. Good afternoon. May it please the court. Katie Kenyon on behalf of Dr. McGrath. Picking up really on where the discussion just left off, summary judgment was appropriate as to Dr. McGrath, regardless of which judge or magistrate this matter would come in front of. If you break down the record, the evidence in this case, which has not changed from the last time Dr. McGrath was in front of this court on summary judgments, there are really three points that Mr. Pearson raises as to Dr. McGrath. That would be the timing of this follow-up appointment. The discharge summary is clear. When Mr. Pearson is released from Somerset Hospital, that follow-up with telemedicine in one week would take place. Telemedicine would not have Mr. Pearson leave in the jail. It would be a follow-up appointment with a surgeon. When Mr. Pearson comes back into the institution, he's seen by Dr. McGrath, who issues a series of orders, including a follow-up appointment one week thereafter. So Dr. McGrath did exactly what was requested by having the follow-up appointment made. The second point is this conversation at home, where the only evidence is Mr. Pearson reporting what someone else told him, or Dr. McGrath's reaction was at home. Even if you take Mr. Pearson's version as accurate, that Dr. McGrath was upset when he was called at home, which I respectfully submit really cannot be supported. The only discussion about that would be inadmissible hearsay. Dr. McGrath still ordered Mr. Pearson placed in the infirmary for observation, ordered medication, and ordered a follow-up appointment as well as lab work, and to push fluids. Let's figure out what's going on here. If there were competent evidence that that statement was made, indicating that the doctor's motivation for prescribing the wait-and-see approach, rather than sending Mr. Pearson, for example, to the emergency room at that point or having some further evaluation at that moment, wouldn't that create a genuine issue of material fact as to whether he had been informed of facts that gave rise to an inference of a substantial risk of harm, and for non-medical reasons, that is because he was mad being disturbed at home, didn't provide the medical care that should have been provided? That's a long question, so I'll break it down really I think into two points. I think that makes an assumption. I think that's speculative that he was mad at home and therefore adopted a wait-and-see approach. And there's absolutely nothing to support that, especially when it goes on to prescribe other medications, pushing fluids, let's wait and see what's happening here, which is a very reasonable, it's a judgment call that the physician has every right to make. As far as the bleeding, if you look at that progress note that was mentioned, it says that the calls reported a copious amount of bleeding. It doesn't say that anyone from medical observed a copious amount of bleeding, and Dr. McGrath was adamant throughout this case that until he actually saw the bleeding himself, he was going to take it under advisement but not act on it. So I don't think that you can infer it was in any way connected to him being upset about being called at home. I think that's a dangerous leap to make, one that would be wholly unsupported. What about just the factual circumstances presented to a jury of a doctor who is aware that a patient just had surgery, is informed, which I don't think is disputed that he was bleeding what was termed copious amounts of blood, and takes a wait-and-see approach in that immediate post-surgery period? Isn't that enough, again, to raise a genuine issue of fact for a jury to consider whether he had awareness of the substantial risk of harm and should have taken other action? No, because I don't think there's been any indication of what the risk of harm is. When Dr. McGrath does see Mr. Pearson the next morning, within less than 12 hours after this telephone call, you have to go back and look at what happened during those 12 hours. Some three hours after the telephone call, the nurse notes that there's no bleeding. He's placing the infirmary there for 24-7 observation, a step that Dr. McGrath took to ensure that Mr. Pearson was watched, was observed. At that point, the bleeding stops. There's no other report of bleeding that night. When Dr. McGrath sees Mr. Pearson at 6.30, 6.45 in the morning, there's still no active bleeding. There's trace amounts of blood in his urine, and Dr. McGrath believes that that's an irritation from the catheter. So he's aware of a potential risk of irritation of the catheter. He's aware that risk of infection, hence ordering antibiotics the day before. But I don't think, again, I think you get into some dangerous territory where you're making a leap that he should be aware of some other excessive risk that wasn't out there. There's absolutely no support from an expert who would indicate that there was any causal link or that there was any harm or delay to Mr. Pearson. The other appellees are now making arguments to qualified immunity. Is that something that you are also raising on appeal as a new claim or defense? I certainly wish that I could. I think it's a gap in the law. In these correctional health care cases, the physicians, the mid-level providers, are considered state actors. Hence, they can have Section 1983 claims made against them. However, they are not considered eligible for qualified immunity. There are some decisions in other areas of the country that have applied qualified immunity, but this circuit has not done so, so no. So is Dr. McGrath employed by the Prison Health Service? Yes, Your Honor, he was employed by Prison Health Services. And they have the contract that Summers said? Yes, Your Honor. Okay. So that's the distinction. Qualified immunity is something that Dr. McGrath would not be eligible for. Certainly, if the court would like to change that precedent. What's your position on the necessity of expert opinion? I think that expert opinion is needed to show in this case that it's not necessarily a serious medical need, but rather the causal connection, the increased risk of harm, the actual harm. I think this circuit has cases indicating that it would be the inmate's burden in this case to show the effect of any purported delay on the inmate. And that's this link that we don't have here as to Dr. McGrath or as to any of the appellees, any of the medical providers. You know, we're in a funny position here because the plaintiff is arguing, well, we don't need expert opinion, and yet they wanted it and didn't get it. And then the possibility is, well, you can't win because you don't have experts. And there's no appeal for the denial of experts. You couldn't help but wonder why not. I can see at first blush that that does appear to be a catch-22. However, one of the depositions taken in this case was of Dr. Pratt and the surgeon, during which time counsel had the ability to ask any number of questions about harm to Mr. Pearson and didn't. And that could be because Dr. Pratt had testified that the appendicitis had happened within hours of the actual surgery and there had been no harm or damage. There was no follow-up question of Dr. Pratt and the surgeon as to the subsequent issues with the injury to the urethra,  Dr. Pratt was a potential defendant, right? Dr. Pratt and the surgeon was being deposed in adversarial capacity. You're suggesting he should have been used by plaintiff's counsel as a quasi-expert to gather evidence to support their deliberate indifference claim? Well, I have to respectfully disagree. I don't think it was taken in an adversarial manner. At the time Dr. Pratt and his deposition was done, the statute of limitations had long expired and there was no way for him to be named as a defendant, nor was that anywhere even remotely suggested in the taking of his deposition. His deposition was taken as a fact witness as the surgeon. As the surgeon who ordered instructions, who Mr. Pearson claims were not followed, as the surgeon who would have been part of the hospital, who would have had access to the records and the follow-up care and or any complications that came from his own surgery, he could talk about the risks or the harm of what would happen. He could have been asked any general background, any general medical questions about irritation caused by a catheter, about damage to the urethra, about risks of excessive bleeding, and wasn't. So I think approving plaintiff's counsel, perhaps in the position that they found themselves, denied expert testimony, could have used a fact witness to obtain basic medical questioning that could very well assist them. Didn't Mr. Pearson seek in March 2014 funds for both records and a certificate of merit to be able to bring a state negligence action against the surgeon in the hospital? He sought funds to do so in March 2014, but I believe the time period that we're dealing with was some five years prior. But that's the same doctor you're suggesting he should have, he was not approaching in an adversarial capacity and should have used to gather expert testimony? Dr. Prada was deposed as a fact witness. And I'm not saying he should have been or could have been used as a closet expert, but counsel could have solicited, could have asked him questions, just general basic medical questions as to risk, as to harm, as to other such things, and did not do so. All of that is really somewhat immaterial, because to even get to the expert analysis, you have to have first found deliberate indifference, and you don't need an expert to review this case to look at the facts as far as Dr. McGrath's role and find that there was deliberate indifference. The facts of this case clearly show care and attention given to Mr. Pearson by all of the medical providers. And if you look at the narrow role of Dr. McGrath, who enters the picture three days after the appendectomy, and each encounter that he had with Mr. Pearson, even the one over the telephone, orders him for observation, gives him medical attention, does not deny him anything. Okay. Ms. Canyon, we'll have you back. We won't have you back. We thank you. I'm done. Thank you. We'll have Mr. Marichli. Thank you, Your Honors. May it please the Court, my name is Kamal Alexander Marichli. I'm representing the Department of Corrections' appellees in this case, all of the appellees except for Dr. McGrath. May I begin with the observation that this case cries out for expert testimony. Were the appellant to be able to make out his claims against the DOC appellees? Is that true as to Nurse Rhodes, where there is documentary evidence that the nurse identified that Mr. Pearson might have appendicitis? Yes, and here's why, Your Honor. Disagreement as to type, this is a process. Medicine is an art and a science, a hackneyed statement, but never more true than when looked at in this particular instance. We have a man with a bellyache. He says it's a severe bellyache, although at times he acts as if it's not particularly severe. We have the possibility, as if you look at the progress notes of Nurse Thomas, Mr. Pearson himself says, I think I pulled a muscle with my asthmatic coughing. That's how this begins. Let's focus on Nurse Rhodes because we have the progress notes from both Nurse Thomas and Nurse Klein that show increasing pain and continuous through the day. We have a call that he's screaming with pain that evening around 11 o'clock, and because he's had two prior visits, the nurse opts not to come or have him come down at that point, and only a couple hours later comes up, allegedly forces him to crawl across the cell because she disbelieves the extent of the pain, and then having documented her belief that it might be appendicitis, opts not to reach out to a physician, not to send him to the emergency room at that point, but to have him wait for a few hours. Isn't that, put aside a nurse and medical training that goes along with that, but even from a layperson's perspective, don't those facts, and with the rebound pain, don't those facts give rise to an inference of a substantial risk of a burst appendix, of serious harm? First, Your Honor, we are not discussing a case of medical nonpractice. That's clear from Estelle V. Gamble. What you've described is a process of nurse Rhodes beginning to perceive for the first time, this is the third examination in a period of less than 24 hours, of Mr. Pearson, that in fact it may not be a pulled muscle, in fact it may not be problems with the fried fish he ate in his gallbladder, and in fact it may be an appendicitis. So he has him taken from his cell and put into the infirmary for the purposes, after all it is 2.50 in the morning when he first encounters Mr. Pearson. May we put the wheelchair incident to the side for the moment. And he then indicates that he's pursuing a course of what he calls watchful waiting. And in fact at 8.10 a.m. that next morning, Nurse Magyar, both of these nurses are men by the way, Nurse Magyar seems to have come across Mr. Pearson, and this is an uncommon in medical situations where his symptoms have relented to a certain degree. He professes that he has an appetite. We should also mention that Nurse Rhodes indicated in addition to the need for him to be in the infirmary for watchful waiting and to have an actual physician make an actual diagnosis, he also said nothing by mouth just in case it were an appendectomy. We know because he documented in the notes his belief that it might be appendicitis. Indeed that it might be an appendicitis, and he put him in the infirmary, and the next morning Nurse Magyar saw him and he didn't appear. The whole situation of his presentation I suggest is characterized by the word equivocal. If you look at the Blackmore case, which they've used as the on-point comparator, it's a situation where no one saw Blackmore for two days, and in addition to having all the problems, he was vomiting, and what, of course I'm not a doctor, but what the Sixth Circuit says in connection with that is vomiting is a particularly key indication combined with abdominal pain of the existence of appendicitis, and in all these situations we see Rhodes, we see Thomas, we see Klein also, and we see Magyar, all of them saying, I beg your pardon, he's not vomiting, he's not nauseated. There may be different ways for a medical professional to reach the diagnosis of possible appendicitis, but however Nurse Rhodes came to that conclusion, he did come to that conclusion and documented it, opting not to send Mr. Pearson to the hospital, and that delay in him being treated apparently caused internal gangrene and other serious harm. Actually, it didn't. If you read Dr. Pratton's deposition and the way I've done it, Dr. Pratton said the radiological information was inconclusive. It didn't show that the tube of the appendix had swollen. He said it's early stages, it's early stages, there's no particular harm, and as for the omentum, he mentions that. The omentum is part of the peritoneum. He mentions it's a policeman of the abdomen. The omentum did its job. It wrapped itself around the inflamed appendix to make sure that when it ruptured, it wouldn't spread and cause peritonitis. That is not something that's an indication of a delayed treatment that violated the Constitution. That, he said, can take place in a matter of a few hours. What we have here is a situation where they're asking for us to say, they've stated, for this court to say, that they have stated a violation of the Eighth Amendment of the Constitution because of the way people related to the ultimate diagnosis of an appendicitis and the removal of his appendix across 24 hours, where four nurses saw him, where a doctor saw him, where he was never neglected, where he was never let alone. And I think there are two ways of looking at this. What it finally resolves itself to is the idea that he ought to have been sent to Somerset Hospital sooner. Our circuit has been recognized as being one of the circuits, along with the First and the Eleventh, unlike the Sixth Circuit, which requires proof, and this is a good case for that because there isn't any harm, proof that whatever delay in medical treatment took place actually caused harm. And they didn't provide that proof. And that's a vital point. And what the district court kept saying in relation to all of the nurses, all of this, no one has said that the mere fact that he's in pain, and they ultimately conclude a few hours before a doctor finally decides that's the correct diagnosis, that he might be having an appendicitis, is somehow not consistent with good nursing practices. Let's go back to talking about good nursing practices. How is it not obvious when Mr. Pearson said that he was in pain, serious pain, and he couldn't walk, okay, that a medical professional, in this case Nurse Rhodes, should have helped him rather than make him crawl in a wheelchair? That's a different point. And the point is when Thomas Magyar saw him at 8, 10 a.m. This is supposedly at ten minutes to three in the morning. At 8, 10 a.m. when Thomas Magyar saw him, he was mobile. He was able to move. He appeared to be making jokes. That's 8, 10 a.m., but what about at three? Well, we can assume that every case, the best I can say is this cannot be, we cannot have a trial based on an inmate's ipsy dixit that somebody did some horrible thing to him which has no way of being proven or disproven. Let's just convene a jury trial in the United States District Court and decide whether or not we believe him or him. Is that testimony less competent than another litigant? In a particular sense, I think he cannot be considered competent in raising a claim that has no extrinsic evidence to support it that he was somehow mistreated in some occult and hidden way that can't be demonstrated to have happened. Where he gives one version of events and there is a contradictory version of events that is given by the putative defendant, are you saying that because he's an inmate, we don't count that as creating a genuine issue of material fact? Well, the alternative would be to say, and none of the cases they cited actually have situations where the inmate's own ipsy dixit was the only point. But if you want to make that point, then I must concede that in fact he has, the only claim that should survive and return for a trial in this case is the claim that while he went to bring him in the wheelchair to the infirmary for the final examination which revealed a suspected appendicitis, according to him, Mr. Rose, so there's no doubt about that, that he somehow made him crawl across the floor to the wheelchair. There's no way to defend that. I didn't raise qualified immunity with respect to that. There's no way I can defend that. So we come down to it then. That's the point. If you want to say that, you know, when no one else was there, he made me crawl to the wheelchair. If you want to say that's enough to have a trial in the United States District Court, then I can do nothing. Don't we also have reversible error in the magistrate judge and the district court here concluding that Nurse Rose lacked the awareness required for a standard of deliberate indifference because he, quote, mistook actual appendicitis for potential appendicitis. Doesn't that on its face misstate the law of the Supreme Court in Pharma? It doesn't need to be awareness that there is certainly going to be harm or knowledge that harm will occur. No, you are not. There needs to be awareness of a risk of harm, a substantial risk of harm. No, Your Honor, we can't say that without expert testimony. What you're saying in that situation is he, when a nurse says, I think you might have an appendicitis, let's put you in the infirmary and in a couple of hours a doctor is going to be here and he'll check and see whether he thinks that's correct. I don't think that's deliberate indifference. It may be medical malpractice in terms of what nursing practice is, but I don't, I think it's a response, if you think in terms of ineffective assistance of counsel in criminal cases, what you're talking about is not necessarily the best response, but a reasonable, we can't on that face say that that's, on the face of those facts, we can't say that that's not a reasonable way a nurse would deal with this particular situation. I want to hear from somebody who knows what they're talking about before I come to a conclusion that that's a sufficient case for Farmer v. Brennan in terms of deliberate indifference. What you're talking about is a situation where just once you say, I think you might have an appendicitis, then that means you have to immediately call an ambulance. Cass, I'd like to ask you the flip side of the question, delicate as it may be, that I asked your colleague. That is, this case is before the Court of Appeals now for the third time, and even now in the report and recommendation that was adopted in full by the district court, we have Mr. Pearson being described as, quote, part of a class of litigants that has uniquely demonstrated to Congress that it files an undue amount of frivolous and meritless lawsuits, suggests that we incorrectly stated the burden of proof, dismisses the instruction regarding expert testimony that was given in the second opinion, the one that Judge Greenberg had on the panel, as a gratuitous comment that was correct only in an existential sense, and describes a claim that we had remanded for consideration against Captain Vepruga as amounting to the flimsiest of non-claims imaginable, just as a handful of the references there made in the opinion. Do you agree we should be concerned at this point about at least an appearance of impropriety or an appearance of bias without any reassignment if this case is going back to the district court? Your Honor, I think the district court could give this man a fair trial and would make every possible effort to do so. The other point is, I think if there's an issue in this instance, it ought to have been raised. It's not raised even in the brief. It certainly wasn't raised in such a way in terms of making it a matter for briefing an argument before this court. In fact, this is the first time it's come up. He's already moved for recusal. He moved for recusal in the district court, but his attorneys did not see fit. There are a lot of things, a lot of rulings that went against him in the lower court. Every single one of them isn't before this court simply because it's now come here on an appeal. He has to at least identify it for the purposes of a plain error at best, or he has to actually raise it in the brief. This is just brought up for the first time this afternoon, and I am not prepared to go beyond my respect for the district court's bench in this case. I think they made, if it's read with some care, I think you see that while magistrate Judge Pesto in particular, I don't think we can discuss Judge Gibson at all, and that's another problem, may have in terms of recusal, what did Judge Gibson do to deserve that? Magistrate Judge Pesto would not be in fact doing a trial unless they consented to jurisdiction in front of the magistrate, which I think is particularly unlikely. Magistrate Judge Pesto took the basic position in this case that this was a med malpractice case, and that in order to demonstrate the violation of the Eighth Amendment as distinct from some sort of violation of duties of care that nurses and doctors have, nurses and doctors in dealing with sick people, that in order to show that this was cruel and unusual punishment inflicted on Mr. Pearson, you would need to have expert testimony that showed that these nurses were in fact so recklessly in disregard of good nursing practice that it had to be viewed as deliberate indifference, or that the harm was in fact realized by the delay, so it had to be deliberate indifference. And I think those are whatever self-indulgence may have been or may not have been reflected in the language used in the report and recommendation. I think those are sensible and reasonable ways of looking at this case. It is for you, this honorable court, to decide whether they are correct as a matter of law. But I do not believe that merely by taking an alternative point of view and trying to justify denying this case a trial in the court on the grounds that were so carefully discussed, that the district court disgraced itself to the point of not being able to be regarded as being able to have a fair trial for this man. Okay, Mr. Richler, thank you for your answer and your response. I thank the court for this argument in this case, and we'll have Mr. Verdream back for rebuttal. Thank you, Your Honor. If I may just touch on a few quick points. Your Honor, as I've stated before, we do not feel that expert testimony is needed in this case. Number one, with respect to the objective prong, it's basically been conceded that he suffered from serious medical needs. Number two, with respect to the cases that are identified in particular in the DOC appellee's briefs, which talk about the harm that was done to the patient, the increase in harm or the increase in damage, those courts talk about needing an expert for that. In our situation here, they're right. Dr. Pratt and said that this was early on. So our claim is not that he increased the damage to Mr. Pearson, but rather that he suffered harm as a result of their either denial or delay. Well, what was the harm? He suffered in pain. He suffered in serious medical pain that was resolved when they took the steps that they ultimately took and that they ultimately should have done prior and sent him off for the two surgeries. So we feel that I'm not even sure that an expert could testify as to what Mr. Pearson felt when he was in pain. That's his subjective complaint. And even if we did need that, Dr. Pratt, who was deposed in this case, talked about that Mr. Pearson was in pain. When he got to the hospital for the appendicitis, he was in pain. So I do not feel that an expert testimony is needed in this case. And Mr. Merkley talked about the comparator case being the Blackmore case. That is not the case that's the comparator case. Our case is Matheson from the Seventh Circuit, which Judge Posner talked about how someone complained of heart pain, chest pain, and four hours later he was finally treated. And he, in fact, had a heart attack the four hours before. And those claims were based on the agony that he suffered from the time he first complained to the time he was finally sent to the hospital. No expert testimony was needed for that. Okay. Thank you, Your Honor. Thank you very much, Mr. O'Dream. Anything else? I don't have anything else. Nothing else? Okay. Let's take a short recess. Yes, we will. And at this time we thank all counsel for their arguments, their excellent arguments in this case. And we'll take this matter under advisement. We'll take a short recess and come back for our next case. Thank you, Your Honor. Thank you.